UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.: 5:07CR-15-R

UNITED STATES OF AMERICA                                                        PLAINTIFF

v.

ANTHONY NEIL LAX                                                                 DEFENDANT

### MEMORANDUM OPINION

This matter is before the Court on Defendant Anthony Lax's Motion to Suppress Evidence (Docket #14). Plaintiff filed a response (Docket #16). A Suppression Hearing was held in this matter on September 13, 2007. This matter is now ripe for adjudication. For the reasons that follow, the Defendant's Motion to Suppress is **DENIED.**

### BACKGROUND

On April 1, 2007, at approximately 6:16 p.m., Deputy Ricky Starks ("Starks") of the Calloway County, Kentucky, Sheriff's Department observed the Defendant, Anthony Neil Lax ("Lax"), fail to stop at a stop sign. Lax was driving a 1996 Nissan pickup truck, and Starks was on routine patrol. Starks is a member of the Calloway County K-9 unit, and his narcotics detector dog, Rocky, was in the patrol car at the time.

Starks subsequently pulled Lax over for disregarding the stop sign. Once the vehicles came to a stop, Starks called in Lax's license plate, then exited his patrol car and approached Lax. There, he asked Lax for his driver's license, registration, and proof of insurance. Lax was unable to provide proof of insurance for the vehicle, but told Starks that he lived nearby, and could call his wife on his cell phone and ask her to bring the proof of insurance to the scene.

Starks agreed, and went back to his patrol car with Lax's driver's license to check the license and search for any outstanding warrants.

After the check came back clear, Starks returned to Lax's vehicle and began asking Lax a few questions. Starks asked Lax if there was anything illegal in his vehicle, and Lax replied "no." Starks then asked if there were any drugs in the vehicle, and Lax's mannerisms became very nervous. He then asked Lax for consent to search his vehicle, and Lax gave verbal consent. Starks asked Lax to sign a written consent form. Lax began to sign the form, but stopped.

At this point, Starks removed his dog Rocky from the patrol car and began walking Rocky around Lax's truck. Lax was standing beside the patrol car and was not restrained. When Rocky reached the driver's side door, he alerted Starks to the presence of drugs. Starks then placed Rocky back inside the patrol car. Starks told Lax that the dog had alerted him to the presence of drugs and asked Lax what he would find if he searched the truck. Lax told Starks that a "meth pipe" was located behind the seat. Starks then read Lax his rights and placed him inside the patrol car while he conducted a search of Lax's truck.

Starks returned to Lax's vehicle and searched the location where Rocky alerted. In doing so, he found a blue plastic container with what appeared to be eight packages of methamphetamine underneath the front part of the driver's seat. Starks showed Lax what he had found and asked Lax what it was. When Lax did not answer, Starks asked if was methamphetamine. Lax did not verbally respond to the question, but nodded his head. Starks then placed him under arrest, handcuffed him, and began searching his person. The search turned up cigarette lighters and $1,493 in U.S. currency.

Starks returned to the vehicle, and found a glass pipe with residue, located behind the

2

passenger's seat on the floorboard, along with a calculator.  Near this time, a second deputy arrived at the scene, Deputy Tidwell ("Tidwell").  Together, Starks and Tidwell searched the bed of Lax's truck, which contained a large metal toolbox spanning the length of the truck's bed.  On the driver's side of the toolbox Deputy Tidwell found 200 .12 gauge shotgun rounds, and on the passenger's side Starks located 300 .22 caliber rounds inside a plastic container wrapped in tape.

Lax's truck was impounded and Starks transferred Lax to the Calloway County Detention Center.  The eight packages of methamphetamine, glass pipe with residue, U.S. Currrency, 500 rounds of ammunition, calculator, cigarette lighters, and Lax's 1996 Nissan pickup truck were seized for evidentiary purposes.

On August 13, 2007, Lax filed a Motion to Suppress all of the evidence seized on April 2, 2007.  A hearing on this motion was held on September 13, 2007.

## DISCUSSION

The Defendant claims (1) the search was conducted without a search warrant and in the absence of exigent circumstances, (2) the property seized was not in plain view, (3) the search was conducted without probable cause, (4) the search was the product of an illegal arrest, because Starks had no authority to arrest the Defendant and the search was conducted prior to an arrest, (5) the search was illegal because the Defendant was not under arrest and the vehicle was searched not incident to an arrest, and (6) the search was without the Defendant's consent.

**1. The Traffic Stop**

"The Fourth Amendment...permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile, regardless of the officer's subjective motivation for the stop." *United States v. Burton*, 334 F.3d 514, 516 (6th Cir.2003) (citing

*Whren v. United States*, 517 U.S. 806, 812-13 (1999)).  There is probable cause "where the facts and circumstances within [the officer's] knowledge...are sufficient...to warrant a man of reasonable caution in the belief that an offense has been or is being committed" *Brinegar v. United States*, 338 U.S. 160, 175-176 (1949).  Here, Starks stopped Lax for a routine traffic violation, pursuant to KRS 189.330(4), which provides that every operator of a vehicle approaching a stop sign shall stop at a designated location.  KRS 189.330(4) (2007).  Starks was traveling directly behind Lax at the time he failed to stop and observed the failure first hand.  Therefore, the Court finds that Starks had probable cause to believe that Lax committed a traffic violation.  Further, Lax does not even contend that he did not violate KRS 189.330(4).  Thus, Starks had probable cause to stop Lax's vehicle for the violation and was permitted to detain it.

**2. The Search of Lax's Vehicle**

Lax objects to Starks' subsequent search of his vehicle on a number of grounds.  However, all of his arguments must fail.  In *Ohio v. Robinette*, 519 U.S. 33 (1996), the Supreme Court held that a motorist's Fourth Amendment rights were not "violated where, after initially being stopped for a traffic violation, the motorist was ordered out of the automobile by the police officer and asked if he would consent to a search of the vehicle for illegal contraband." *Burton*, 334 F.3d at 517 (citing *Robinette*, 519 U.S. at 35-36).  In *Robinette*, the Court held that asking a detained motorist whether he would consent to a search of his automobile for contraband, even after the motorist produced a valid driver's license, did not necessarily make the traffic stop unreasonable in its scope or duration.  *Id.* at 519 (citing *Robinette*, 519 U.S. at 39).  In such a situation, the detention of the motorist and any subsequent questioning only need to be reasonable under the circumstances.  *United States v. Biles*, 100 Fed. Appx. 484, 486 (6th Cir.

4

2004) (citing *Burton*, 334 F.3d at 517 (citing *Robinette*, 519 U.S. at 39)).

In *Burton*, the Court noted the Seventh Circuit opinion in *United States v. Childs*:

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public--for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

*Burton*, 334 F.3d at 518 (citing *United States v. Childs*, 277 F.3d 947, 954 (7th Cir. 2002) (en banc)).

In *United States v. Childs*, the Court upheld a search where a police officer obtained the motorist's consent by asking him three questions unrelated to the purpose of the traffic stop. *Id.* at 519 (citing *Childs*, 277 F.3d at 954). In this case, Starks decided to ask Lax if there were any illegal substances or drugs in his vehicle, a question which was unrelated to the purpose of the stop-Lax's failure to stop at a stop sign. Starks testified at the Suppression Hearing that he had been trained to ask that type of question during a traffic stop. When Starks mentioned drugs, Lax's mannerisms became very suspicious. He began fidgeting and looked away when answering. Starks testified that in his experience, such a response usually indicates that something is wrong. Starks asked Lax for consent to search the vehicle, and Lax gave him verbal consent to do so. Starks did not threaten any kind of retaliation if Lax refused to answer his questions or objected to the search. Under these circumstances, Starks' request was reasonable.

Further, Lax's consent was voluntary. In determining whether consent given was voluntary, the Court should examine "the age, intelligence, and education of the individual; whether the individual understands his or her constitutional rights: the length and nature of detention; and the use of coercive or punishing conduct by the police. *Biles*, 100 Fed. Appx. at

5

490 (citing *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (citations and quotations omitted)).  Lax is an adult, and is of proper intelligence and education to understand his rights. Lax stood unrestrained near the patrol car during the dog's search.  There is no evidence that Officer Sparks threatened, coerced, or in any way rendered Lax's consent involuntary.

Once Starks brought Rocky out to search Lax's vehicle, Rocky alerted to the presence of drugs on the driver's side of the vehicle.  Starks had worked with Rocky for three years, knew the signs Rocky used when he alerted to drugs, and reasonably believed that narcotics were present in the truck.  Starks told Lax that the dog had indicated the presence of drugs in the vehicle, and when he asked Lax what he would find if he searched the vehicle, Lax voluntarily told him there was a "meth pipe" in the truck.  It was at this point that Starks read Lax his rights, placed him in his patrol car, and began his search of Lax's truck.

Lax argues that Starks' search of the truck was improper because he did not have a warrant, and the vehicle was not searched incident to arrest.  However, Starks did have probable cause to conduct the search and did not need to obtain a warrant because a "positive indication by a properly trained narcotics detecting dog is sufficient to establish probable cause to search for the presence of a controlled substance." *United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999).  The "automobile exception" excuses the police from obtaining a warrant to search private property when they have probable cause to believe that a vehicle they have stopped contains evidence of a crime. *Id.* (citing *United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994) (citing *Carroll v. United States*, 267 U.S. 132 (1925)).  "An alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle." *Id.* (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)).  Therefore, once

Rocky alerted Starks to the presence of drugs in Lax's truck, Starks had probable cause to search the vehicle and seize any evidence he found therein. For these reasons, the evidence seized from the Defendant's truck should not be suppressed.

### 3. The Search of Lax's Person

After Starks found the methamphetamine in Lax's truck, he placed Lax under arrest. Once Lax was handcuffed, Starks searched his person. The search turned up cigarette lighters and $1,493 in U.S. currency.

Under the Fourth Amendment, "an arresting officer may, without a warrant, search a person validly arrested." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (citing *United States v. Robinson*, 414 U.S. 218 (1973); *Gustafson v. Florida*, 414 U.S. 260 (1973)). There is no requirement that the person arrested indicate that he possesses weapons or evidence; instead, "a lawful arrest, standing alone, authorizes a search." *Id.* (citing *Robinson*, 414 U.S. at 235).

In this case, Lax was arrested after Starks found drugs in his vehicle pursuant to a lawful search. The arrest was valid when made; therefore, the search pursuant to the arrest was valid, and the evidence found on his person should not be suppressed.

### 4. The Inventory Search of Lax's Vehicle

After Starks placed Lax in custody, he and Tidwell began an inventory search of Lax's truck at the scene. In the course of that search, the deputies discovered 500 rounds of ammunition in the toolbox in the truck bed. Lax has previously been convicted of a felony, and was subsequently charged with possession of ammunition while a convicted felon. He has moved to suppress this evidence uncovered during the inventory search.

The inventory search is a "well-defined exception to the warrant requirement." *Colorado*

7

*v. Bertine*, 479 U.S. 367, 371 (1987) (citing *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983)). "An inventory search may be reasonable under the Fourth Amendment even though it is not conducted pursuant to a warrant based upon probable cause." *Id.* When a vehicle is impounded pursuant to a lawful arrest, its owner has a diminished expectation of privacy, and the police have a strong interest in protecting themselves from any danger the vehicle or its contents may pose. *See, id.* at 372. The courts afford deference to police implementing "caretaking procedures designed to secure and protect vehicles and their contents within police custody." *Id.* (citing *Cooper v. California*, 386 U.S. 58, 61-62 (1967); *Harris v. United States*, 390 U.S. 234, 236 (1968); *Cady v. Dombrowski*, 413 U.S. 433, 447-448 (1973)).

Lax has made no showing that Starks and Tidwell were doing anything other than following the standardized procedures of the Calloway County Sheriff's Department in conducting their inventory search of Lax's vehicle. There is no evidence that they conducted the inventory search in bad faith. Instead, the deputies had a responsibility to secure the property that was in their custody, and knowledge of the vehicle's contents helped guard against any danger the contents may have caused. *See generally*, *Bertine*, 479 U.S. at 373. For these reasons, the evidence found pursuant to the inventory search should not be suppressed.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress is **DENIED.**

An appropriate order shall issue